**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
                                :

ROSA VALENTIN,                :

                             :

       Plaintiff,          :

                             :          Civil Action No. 05-4503 (JAG)

            V.            :

                             :          **OPINION**

COMMISSIONER OF SOCIAL    :

SECURITY ADMINISTRATION,  :

                             :

                             :

       Defendant.      :
_____:

**GREENAWAY, JR., U.S.D.J.**

      Plaintiff Rosa Valentin seeks review of the Social Security Commissioner's (the "Commissioner") decision denying her applications for Social Security Income ("SSI") and Supplemental Security Income Disability ("SSD") benefits, pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g).[1]  Plaintiff argues that the decision is not supported by substantial evidence, as required by § 405(g), and that the Commissioner erred as a matter of law in denying her applications.  For the reasons set forth in this Opinion, this Court finds that the Commissioner's decision is supported by substantial evidence and should be affirmed.

_____

[1] This section of the Social Security Act (hereinafter the "Act") provides that any individual may obtain a review of any final decision of the Secretary made subsequent to a hearing to which he or she was a party.  The federal district court for the district in which the plaintiff resides is the appropriate place to bring such action.  42 U.S.C. § 405(g).

# I. <u>PROCEDURAL HISTORY</u>

On August 21, 2001, Plaintiff filed applications for SSI and SSD benefits, pursuant to Sections 216(i), 223, and 1614(a)(3)(A) of the Social Security Act, codified as 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A), respectively.[2]  (Tr. 23.)[3]  Plaintiff's application alleges that her disability commenced on March 11, 2000 due to high blood pressure, anxiety, nerves, depression, asthma, diabetes, problems with her heart, and cholesterol.  (Pl.'s Br. at 1.)  Plaintiff's claims were denied initially and on reconsideration, and she timely filed a hearing request.  (Tr. 23.) Plaintiff's hearing was held before Administrative Law Judge ("ALJ") Ralph Muehlig, who denied Plaintiff's claims in a decision dated August 13, 2003.  (Tr. 27.)

ALJ Muehlig concluded that Plaintiff was not entitled to a Disability Period, Disability Insurance Benefits, and not eligible for SSI payments under Sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Act.  ALJ Muehlig found that:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2003.

2. The claimant has not engaged in substantial gainful activity since her alleged onset of disability.

3. The claimant's hypertensive cardiovascular disease with angina, asthma, and non-insulin dependent diabetes mellitus are severe impairments, based upon the requirements in the Regulations (20 C.F.R. §§ 404.1521 and 416.921).

---

[2] The record shows that Plaintiff filed a previous disability insurance application on October 19, 1998, which was denied by an Administrative Law Judge on March 10, 2000, and affirmed by the Appeals Council on July 18, 2001.  (Tr. 23.)

[3] The Act instructs the Secretary to file, as part of her answer, a certified copy of the transcript of the record, including any evidence used to formulate her conclusion or decision.  42 U.S.C. § 405(g).  "Tr." refers to said transcript.

4.      This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The claimant's subjective complaints of pain, symptoms, and limitation are not totally credible for the reasons set forth in the body of the decision.

6.      I have carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 C.F.R. §§ 404.1527 and 416.927).

7.      At all material times the claimant retained the residual functional capacity to perform light work involving the occasional lifting and carrying of objects weighing twenty pounds; standing, walking, and sitting for six hours during the course of an eight hour day; not requiring exposure to extremes in temperatures or other pulmonary irritants.

8.      The claimant's past relevant work as a towel cleaner did not require the performance of work-related activities precluded by her residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

9.      The claimant's medically determinable hypertensive cardiovascular disease with angina, asthma, and non-insulin dependent diabetes mellitus does not prevent the claimant from performing her past relevant work.

10.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. §§ 404.1520(e) and 416.920(e)).

(Tr. 26-27.)

Plaintiff requested review of Muehlig's decision on September 8, 2003.  (Pl.'s Br. 2.)  On July 15, 2005, Plaintiff's request was denied by the Appeals Council.  (Tr. 7.)  Accordingly, ALJ Muehlig's decision became the Commissioner's final decision.  On September 13, 2005, Plaintiff filed a complaint in this Court, pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), seeking reversal of the Commissioner's decision.

## II. STATEMENT OF THE FACTS

### A.    Background

Plaintiff Rosa Valentin was born on April 18, 1949.  (Tr. 77.)  Plaintiff does not speak

much English.  (Tr. 30-31.)  Plaintiff was 51 years old when she applied for SSI, and 54 years old

when ALJ Muehlig rendered his decision, which noted that Plaintiff had a sixth grade education

level, and that her past work included employment as a machine operator and a towel cleaner.

(Tr. 24, 68.)  Plaintiff noted that her work as a towel cleaner required her to sit for 8 hours a day,

and her work as a machine operator required her to lift about 50 pounds frequently, stand and

walk for about 6 hours a day, and handle or grasp big objects for about 6 hours a day.  (Tr. 82, 83.)

Plaintiff stopped working in 2000.  (Tr. 68.)

### B.    Claimed Disabilities

Plaintiff claims that her disability commenced on March 11, 2000, due to high blood

pressure, anxiety, nerves, depression, asthma, diabetes, problems with her heart, and cholesterol.

(Tr. 24.)  On July 16, 2003, before ALJ Muehlig, Plaintiff testified that her high blood pressure

was attributed to family problems and a big accident her daughter was involved in.  (Tr. 32.)

Plaintiff claims that her nervousness began after the accident.  (Id.)  The record also indicates that

Plaintiff complained of having pain in her legs and not being able to stand or sit for very long.

(Tr. 31-32.)

Plaintiff also testified that she was having heart palpitations and chest pain.  (Tr. 32.)

Plaintiff claimed her chest pain was due to her high blood pressure and the agitation she was

having at work.  (Id.)  Plaintiff also testified that she had an enlarged heart.  (Tr. 32.)  Plaintiff's

attorney noted that Plaintiff also suffered from some psychiatric problems, but the psychiatric

4

problems did not seem to be severe.  (Tr. 37.)

### C.    Medical Evidence Considered by the ALJ

ALJ Muehlig noted that Plaintiff was treated by Dr. Jose Santana, Dr. Maria Vastesaeger, and Dr. Michael Block, among others.

#### 1.    Dr. Santana

Dr. Jose Santana is Plaintiff's primary physician.  (Pl.'s Br. at 3; see also Tr. 183.)  On November 16, 2000, Dr. Santana diagnosed Plaintiff with angina pectoris, hypertension, hyperlipidemia, and bronchial asthma.  (Tr. 184.)  Dr. Santana noted Plaintiff's blood pressure was 170/90, pulse 72, and respirations 18.  (Id.)  Plaintiff's echocardiogram showed "mild left ventricular hypertrophy with preserved left ventricular systolic function."  (Id.)  Her ejection fraction was estimated at 50%, and a diastolic dysfunction was noted.  (Id.)  Dr. Santana recommended weight loss, blood work, and a stress perfusion scan following his assessment.  (Id.)

Plaintiff underwent her stress perfusion scan on November 27, 2000.  (Tr. 183.)  On December 14, 2000, Dr. Santana noted that the stress perfusion scan results were negative and discussed the test results with Plaintiff.  (Tr. 180, 183.)  Plaintiff's left ventricular ejection fraction was found to be within normal limits.  (Tr. 183.)  On a February 15, 2001 follow up visit, Dr. Santana diagnosed plaintiff with hypertension, hypertensive cardiovascular disease, stable angina pectoris, non-insulin dependent diabetes mellitus, and hyperlipidemia.  (Tr. 179.)  He also noted that Plaintiff's blood pressure had decreased from 170/90 to 130/82.  (Id.)  Santana noted a pulse of 78, and that Plaintiff's respirations were 16.  (Id.)

Dr. Santana's February 15, 2001 report indicates that Plaintiff had been "advised to stop [certain medication] because [her] blood pressure [was] stable."  (Id.)  Plaintiff was asked to

5

follow up with another doctor regarding her diabetes mellitus.[4]  (Id.)  Dr. Santana's last report was

dated July 19, 2001 - Plaintiff's follow-up cardiovascular visit date.  (Tr. 175.)  In this report, Dr.

Santana noted that Plaintiff "had been monitoring [her] blood pressure before [the] visit and she

had been mostly in the normal range."  (Id.)  Plaintiff "deni[ed] any episodes of palpitations, ha[d]

atypical chest symptoms, right sided, only when she got excited, [and] not during the nighttime."

(Id.)  Her blood pressure was 130/84, pulse 72, and respirations 16.  (Id.)  Dr. Santana advised

Plaintiff to "continue monitoring [her] blood sugar as well as [her] blood pressure."  (Id.)

### 2.      Dr. Maria Vastesaeger

Dr. Vastesaeger conducted Plaintiff's February 12, 2002, consultative examination.  (Tr.

295.)  Vastesaeger's physical examination revealed that Plaintiff had "[s]urface tenderness to [her]

posterior neck and dorsal spine, [her] flexion LS spine decreased to 50 degrees, and [plaintiff

suffered] palpable crepitations to both knees, but normal range of motion to both knees.  (Tr.

297.)  Dr. Vastesaeger noted "no localized pain to [Plaintiff's] lower legs."  (Id.)  Plaintiff had

"normal gait and station without cane or crutches."  (Id.)  Plaintiff's "blood pressure [was] 120/88,

pulse 58 [], weight 173, [and] height 58 inches."  (Id.)  Dr. Vastesaeger noted that Plaintiff

mounted and got off a table well.  (Id.)  Vastesaeger also noted that Plaintiff had a  "[n]ormal

EKG, [and] respective pattern on spirometry," and suffered no acute respiratory distress.  (Tr. 298,

299.)

### 3.      Dr. Michael Block

Dr. Block conducted a psychiatric consultative exam on February 21, 2002.  (Tr. 318.)  Dr.

---

[4] Plaintiff was asked to "follow closely with Dr. Mistry regarding [her] diabetes mellitus."
(Tr. 179.)

6

Block found "no evidence of psychomotor agitation or depression." (Tr. 319.) According to Dr. Block, Plaintiff's "speech was coherent and goal directed and she related reasonably well and was able to establish adequate eye contact." (Id.) "There was no evidence of auditory or visual hallucination and no evidence of paranoia nor of suicidal thoughts." (Id.) In Dr. Block's words, "[t]he only apparent sign of [Plaintiff's] depression . . . appear[ed] to be her sleeplessness, loss of weight and decreasing energy and concentration abilities." (Tr. 320.) Dr. Block noted that Plaintiff's "mental status show[ed] no deficiency, even though she ha[d] been treated with Zoloft and Serzone in the past." (Id.)

Plaintiff informed Dr. Block that her daily activities consist of washing and dressing; making breakfast; taking her medications; cooking; and cleaning her house. (Tr. 319.) Plaintiff also noted that she "goes out in the evening on occasion two or three times a week to church." (Id.)

Dr. Block concluded that Plaintiff suffered from anxiety disorder and depression NOS,[5] bronchial asthma, hypertension, diabetes mellitus, hypocholesterolemia, joblessness, and a GAF of 45 to 50.[6] (Id.)

_____

[5] When several core features of a particular diagnosis present themselves, but individual characteristics do not give rise to any one subcategory, a description of "NOS," meaning "Not Otherwise Specified," is given. A diagnosis followed by "NOS" does not put the principle diagnosis in doubt. Honorable Jessie B. Gunther, *Reflections On The Challenging Proliferation Of Mental Health Issues In The District Court And The Need For Judicial Education*, 57 ME. L. REV. 554 n. 43 (2005) (defining NOS).

[6] A GAF scale ranges from 0 to 100. Generally, a lower score indicates a more serious mental disorder. A score of 0 stands for "inadequate information," and a score of 100 indicates "[s]uperior functioning in a wide range of activities." American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: FOURTH EDITION 27 (Text Revision 2000). A GAF score of 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

**D.**     **Additional Medical Evidence**

In 1998, Plaintiff filed for SSI disability insurance, but was not granted disability leave because "her psychiatric illness [was] not severe enough." (Tr. 122-123.) Dr. Robert Elswit examined Plaintiff at that time. On September 6, 2002, Dr. Amy Brams completed a medical opinion on Plaintiff's mental condition and concluded that Plaintiff's impairments were not severe. Also, on September 3, 2002, Dr. Burke performed a residual functional capacity assessment on Plaintiff. A prior residual functional capacity assessment was performed on March 26, 2002.

**1.     *Dr. Robert Elswit***

Dr. Elswit examined Plaintiff on December 8, 1998. (Tr. 122.) Plaintiff was 49 years old at the time. (Id.) Elswit noted that Plaintiff was hospitalized in February of 1998 "for three days with high blood pressure and chest pain." (Id.) At that time, Plaintiff informed Dr. Elswit that "her problems began five years [earlier] after her daughter's car accident when [Plaintiff] became increasingly anxious and began to avoid doing things that made her feel nervous." (Id.) Plaintiff noted that she suffered "a variety of physical and mental symptoms of anxiety;" felt restless; got tremors; suffered "multiple aches and pains in her side [and] legs;" and suffered headaches. (Id.) Plaintiff stated that "[a]s a result of these problems her primary care physician put her out of work on disability." (Id.)

Dr. Elswit found that "in spite of [Plaintiff's] complaints of anxiety and somatic complaints she seem[ed] to function fairly well, doing her housework, grocery shopping, visiting, going to church, taking care of herself, her grooming, etc." (Tr. 122-123.) Dr. Elswit also found that Plaintiff "ha[d] no prior psychiatric illnesses," but Plaintiff did have "a history of

hypertension and angina." (Tr. 123.) Dr. Elswit noted "no formal thought disorder," a neutral mood, an appropriate affect, "no delusions or hallucinations[,]" and "[n]o suicidal or homicidal ideations." (Id.)

Dr. Elswit concluded that Plaintiff had "symptoms of anxiety and somatic symptoms increasingly severe since her hospitalization for hypertension earlier in [that year.]" (Id.) Dr. Elswit did note, however, that Plaintiff "seemed able to function fairly well." (Id.) Dr. Elswit did not write Plaintiff "out for disability in spite of her request because it was felt that her psychiatric illness [was] not severe enough to be written out of work." (Id.)

### 2.    *Dr. Amy Brams*

Dr. Brams, a State agency psychologist, completed a medical opinion on Plaintiff's condition on September 6, 2002. (Tr. 342.) Dr. Brams found Plaintiff's mental impairment was not severe. (Tr. 342.) She noted that Plaintiff suffered from a depressive disorder and anxiety NOS. (Tr. 345, 347.) Dr. Brams also examined Plaintiff's functional limitations.[7] (Tr. 352.)

Dr. Brams found that Plaintiff had a "mild" functional limitation in the areas of: (1) restriction of activities of daily living; (2) difficulties in maintaining social functioning; and (3)

---

[7]Functional Limitation analysis is used in the evaluation of mental impairments. 20 C.F.R. § 404.1520a. An applicant's functional limitation is rated based on the extent to which impairment(s) interfere with the applicant's "ability to function independently, appropriately, effectively, and on a sustained basis." Id. at (c)(2). "[T]he quality and level of [an applicant's] overall functional performance, any episodic limitations, the amount of supervision or assistance [an applicant] require[s], and the settings in which [an applicant] [is] able to function," are factors considered in determining functional limitation. Id.

The degree of limitation is rated in the areas of (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. Id. at (c)(4). In rating the first three functional areas, a five-point scale is used: "[n]one, mild, moderate, marked, and extreme." Id. In rating the fourth functional area, a four point scale is used: "[n]one, one or two, three, four or more." Id. "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." Id.

difficulties in maintaining concentration, persistence, or pace.  (Id.)  No episodes of decompensation were found.  (Id.)

### 3.     *Dr. Burke*

Dr. Burke noted that Plaintiff's "symptoms will have some impact on [her] ability to function in an effective persistent manner at work."  (Tr. 339.)  On September 3, 2002, Dr. Burke performed Plaintiff's residual functional capacity assessment.  (Tr. 334.)  Dr. Burke opined that Plaintiff could sit for a total of 6 hours in an 8 hour workday, stand or walk for at least 2 hours in an 8 hour workday, and occasionally lift and/or carry up to 20 pounds.  (Tr. 335.)

A residual functional capacity assessment conducted by another doctor revealed Plaintiff could lift up to 25 pounds, stand or walk about 6 hours in an 8 hour day, sit for about 6 hours in an 8 hour day, and can push or pull if required.  (Tr. 325.)  This assessment was dated March 26, 2002.  (Tr. 331.)  _____

## III. <u>DISCUSSION</u>

### A.     <u>Standard of Review</u>

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g) and 1383(c)(3); <u>Stunkard v. Sec'y of Health and Human Services</u>, 841 F.2d 57, 59 (3d Cir. 1988); <u>Doak v. Heckler</u>, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance."  <u>Brown v. Bowen</u>, 845 F.2d 1211,

1213 (3d Cir. 1988) (citing Stunkard, 841 F.2d at 59). The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision. See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981). Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom. Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history and present age." Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981). Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence that may also support a different conclusion. Blalock, 483 F.2d at 775.

**B.      Statutory Standards**

The claimant bears the initial burden of establishing his or her disability. 42 U.S.C. § 423(d)(5). To qualify for SSD or SSI benefits, a claimant must first establish that she is needy and aged, blind, or "disabled." 42 U.S.C. § 1381. A claimant is deemed "disabled" under the Act if she is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

11

be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A);

see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). Disability is predicated on whether

a claimant's impairment is so severe that she "is not only unable to do her previous work but

cannot, considering her age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); see

also Nance v. Barnhart, 194 F. Supp.2d 302, 316 (D. Del. 2002). Finally, while subjective

complaints of pain are considered, alone, they are not enough to establish disability. 42 U.S.C. §

423(d)(5)(A). An impairment only qualifies as a disability if it "results from anatomical,

physiological or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

### C.      The Five Step Evaluation Process and the Burden of Proof

Determinations of disability are made by the Commissioner, pursuant to the five-step

process outlined in 20 C.F.R. § 404.1520. At the first step of the review, the Commissioner must

determine whether the claimant is currently engaged in substantial gainful activity.[8] 20 C.F.R. §

404.1520(b). If a claimant is found to be engaged in such activity, the claimant is not "disabled,"

and the disability claim will be denied. Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

At step two, the Commissioner must determine whether the claimant is suffering from a

severe impairment. 20 C.F.R. §§ 404.1520(a)(ii), (c). An impairment is severe if it "significantly

limits [a claimant's] physical or mental ability to do basic work activities." Id. In determining

whether the claimant has a severe impairment, the age, education, and work experience of the

claimant will not be considered. Id. If the claimant is found to have a severe impairment, the

_____

[8] Substantial gainful activity is "work that involves doing significant and productive
physical or mental duties; and is done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

12

Commissioner addresses step three of the process.  At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's impairment(s) meets or equals one of the listed impairments, she will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit found that to deny a claim at step three, the ALJ must specify which listings[9] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that an ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis," but must merely ensure "that there be sufficient explanation to provide meaningful review of the step-three determination."  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."  Scatorchia v. Comm'r of Soc. Sec., 137 Fed. Appx. 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform her past relevant work, she will not be found disabled under the Act.  If the claimant is unable to resume her past work, and her condition is deemed "severe," yet not listed, the evaluation moves to the final step.

---

[9] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At the fifth step, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds a significant number of jobs that claimant can perform, claimant will not be found disabled.  Id.

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner, in the five-step process, "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  Moreover, "the combined impact of the impairments will be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp.2d 360, 369 (D. Del. 2003).  The burden, however, still remains on the Plaintiff to prove that the impairments in combination are severe enough to qualify her for benefits.  See Williams v. Barnhart, 87 Fed. Appx. 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801 at *2 (E.D. Pa. Jun. 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

### D.      ALJ Muehlig's Findings

ALJ Muehlig applied the five-step sequential evaluation and determined Plaintiff was not disabled within the meaning of the Act.  (Tr. 25.)

### 1.      Step-One

ALJ Muehlig found that Plaintiff satisfied step-one of the evaluation process because she

"ha[d] not engaged in any substantial gainful activity since her alleged onset date."  (Id.)

### 2.    *Step-Two*

Regarding step-two, ALJ Muehlig found that:

> the evidence establish[ed] the existence of a 'severe' impairment
> involving hypertensive cardiovascular disease with angina,
> asthma, and non-insulin dependent diabetes mellitus, but d[id] not
> disclose any medical findings which m[et] or equal[ed] in severity
> the clinical criteria of any impairment listed in Appendix 1,
> Subpart P to Regulations No. 4.

(Id.)  ALJ Muehlig also noted that "there [was] no objective medical evidence establishing

'severe' impairments regarding depression or anxiety."  (Id.)

ALJ Muehlig relied on Dr. Michael Block's report, which "indicated that [Plaintiff]

showed no evidence of psychomotor agitation, depression, paranoia, obsessive compulsion,

looseness of association, or flight of ideas during [her] February 2002 consultative examination."

(Id.)  ALJ Muehlig also noted that his conclusion was "supported by the assessment of the state

Agency physician's [sic] who also concluded that [Plaintiff] did not have a severe mental

impairment."  (Id.)

ALJ Muehlig found that there was "no evidence of end organ [sic] damage or stroke, and

[that Plaintiff] had not been hospitalized due [to] exacerbation of uncontrolled hypertension or

diabetes."  (Id.)  ALJ Muehlig also found that "evidence [] document[ed] . . . [Plaintiff's]

subjective complaints of episodes of chest pain, shortness of breath, and palpitations; however, a

chest x-ray, EKG, and thallium stress test were normal."  (Id.)  ALJ Muehlig noted that "[d]espite

the [Plaintiff's] complaints of disabling pain and limitations, her activities of daily living were not

compromised by a mental or physical impairment."  (Tr. 26.)  ALJ Muehlig also noted that

Plaintiff "reported that [she] was able to independently take care of her personal hygiene, prepare

meals, clean the house, take her medication, maintain relationships with friends, socialize two to three times a week, wash cloths, wash dishes, and go to church."  (Id.)  In conclusion, ALJ Muehlig found that "[w]hile [Plaintiff's] impairments may impose some discomfort and limitation, they [were] not disabling and d[id] not preclude work related activities."  (Id.)

### 3.    Step-Three

ALJ Muehlig concluded that the evidence failed to "disclose any medical findings which [met] or equal[ed] in severity the clinical criteria of any impairment listed in Appendix 1, Subpart P to Regulations No. 4."  (Tr. 25.)  Muehlig found that Plaintiff's "complaints of disabling pain and other symptoms and limitations precluding all significant work activity, especially regarding her assertions about limitations on walking, lifting, and carrying, [were] not credible or consistent with Social Security Ruling 96-7p, 20 C.F.R. 404.1569, and 20 C.F.R. 416.969."  (Id.)  In reaching this conclusion, ALJ Muehlig relied on medical reports by Dr. Block and Dr. Burke, among others.  (Id.)

ALJ Muehlig found that the "summarized medical evidence . . . could not reasonably produce [Plaintiff's] alleged subjective complaints precluding work-related activities."  (Id.)  In evaluating Plaintiff's subjective complaints, Muehlig considered:

> (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities and work record.

(Id.)  Upon consideration, Muehlig concluded that Plaintiff's "complaints of disabling symptoms [could not] be reasonably accepted."  (Id.)

### 4.    Step-Four

ALJ Muehlig noted that Plaintiff "suffer[ed] some pain and limitations due to her

impairments, and as a result, her capacity to perform work ha[d] been significantly affected." (Tr. 26.)  ALJ Muehlig nonetheless found that although Plaintiff "suffered from a medically 'severe' impairment, the evidence establishe[d] that [Plaintiff] ha[d] the capacity to function adequately [in] perform[ing] many basic activities associated with work."  (Id.)

Upon reviewing the state Agency physicians' medical reports on Plaintiff, ALJ Muehlig concluded that Plaintiff retained "the residual functional capacity to perform the external demands of light work involving the occasional lifting and carrying of objects weighing twenty pounds; standing, walking, and sitting for six hours during the course of an eight hour day; not requiring concentrated exposure to pulmonary irritants or extremes in temperature."[10]  (Tr. 26, 335 - 341.)

According to ALJ Meuhlig, the evidence showed that Plaintiff could perform her past relevant work as a towel cleaner.  At that job, Plaintiff was required to "sit for eight hours and lift up to twenty pounds."  (Tr. 26, 82)  "Based on [the] residual functional capacity for light work, [ALJ Muehlig] [determined] that [Plaintiff] could perform her past relevant work as a towel cleaner."  (Id.)

### E.      Analysis

Plaintiff contends that ALJ Muehlig's decision should be reversed because his decision is not supported by substantial evidence, and he "erred as a matter of law in denying her claim for

---

[10]  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  20 C.F.R. § 404.1567(b).

Social Security and Supplemental Security Income disability benefits." (Pl.'s Br. 1.) Plaintiff

contends that the ALJ: 1) erred at step-three of the sequential evaluation process; 2) erred as a

matter of law in failing to evaluate Plaintiff's impairment in accordance with 20 C.F.R. §

404.1520 and SSR 96-8P; 3) failed to evaluate Plaintiff's pain and other symptoms properly; and

4) did not base his finding that Plaintiff had the residual functional capacity to return to her past

relevant work on substantial evidence. (Id.)

### 1.      Whether The ALJ Erred At Step-Three Of The Sequential Evaluation Process

Plaintiff claims that ALJ Muehlig erred at step-three of the sequential evaluation process.

According to Plaintiff, ALJ Muehlig "did not mention whether the combined effect of [Plaintiff's]

impairments might equal a Listing." (Id.)

Burnett provides that "the burden is on the claimant to present medical findings that show

his or her impairment matches a listing or is equal in severity to a listed impairment." 220 F.3d at

120 n.2. Sullivan v. Zebley, 493 U.S. 521, 531 (1990), which Plaintiff cites in her brief, provides:

> For a claimant to qualify for benefits by showing that h[er] unlisted impairment, or
> combination of impairments, is "equivalent" to a listed impairment, **[s]he must
> present medical findings** equal in severity to all of the criteria for the one most
> similar listed impairment.

(emphasis added). Though Plaintiff asserts that the ALJ erred in his step-three analysis, she fails

to point to any Listing that she believes she has met based on the medical findings.

Plaintiff contends that Muehlig's decision lacks adequate medical support and that ALJ

Muehlig "simply assumed the absence of equivalence without any relevant discussion." (Pl.'s Br.

8-9.) According to Plaintiff, "there [was] no medical assessment in the record from any physician,

whether treating, consultative, or non-examining, concerning equivalency." (Id. at 8.)

"Burnett does not require the ALJ to use particular language or adhere to a particular format

18

in conducting his analysis.  Rather, the function of <u>Burnett</u> is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." <u>Barnhart</u>, 364 F.3d at 505.

ALJ Muehlig found that Plaintiff's "hypertensive cardiovascular disease with angina, asthma, and non-insulin dependent diabetes mellitus [were] severe impairments, based upon the requirements in the Regulations;" however, the "medically determinable impairment d[id] not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (Tr. 27.)  ALJ Muehlig noted that Plaintiff's "chest X-Ray and EKG," taken on February 12, 2002 by Dr. Maria Vastesaeger, were normal.  (Tr. 24.)  ALJ Muehlig also noted that plaintiff had a non-elevated blood pressure of 120/88 during Dr. Vastesaeger's examination, and no evidence of end-organ damage, stroke, or hospitalization due to hypertension or diabetes during the relevant period.  (Tr. 25.)

Muehlig took into account the reports of "highly qualified state Agency physicians." (Tr. 26.)  These physicians considered the listings in their evaluations and found that none were met. (Tr. 42, 43 - box 26.)  Furthermore, ALJ Muehlig noted that Plaintiff "never had heart surgery, or surgery to the vessels of the heart." (Tr. 25, 295.)

<u>Barnhart</u> outlines the current standard an ALJ must follow in evaluating available medical evidence.  364 F.3d at 505.  An ALJ satisfies "this standard by clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant Listing." <u>Scatorchia</u>, 137 Fed. Appx. 468 (citing <u>Jones</u>, 364 F.3d at 505); <u>see</u> <u>also</u> <u>Rembert v.  Scatorchia v. Comm'n of Soc. Sec.</u>, 142 Fed. Appx. 570, 572 (3d Cir. 2005).  ALJ Muehlig properly discharged his responsibilities under <u>Jones</u>.  This Court discerns no error with respect to the ALJ's step-three analysis.

###### 2.    Whether the ALJ Erred as a Matter of Law in Failing to Evaluate Plaintiff's Mental Impairment In Accordance with 20 C.F.R. § 404.1520 and SSR 96-SP

Plaintiff also contends that the ALJ's evaluation of her mental impairment was insufficient.

42 U.S.C. § 421(h) provides that:

> [a]n initial determination . . . that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Secretary has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

See Andrade v. Sec'y of Health and Human Services, 985 F.2d 1045 (10th Cir. 1993).  Section 421(h) "applies to claims for SSI, as well as those for disability insurance benefits."  See Hill v. Sullivan, 924 F.2d 972, 974 (10th Cir. 1991).  The Hill court, citing 20 C.F.R. § 404.1520a, noted that when "the record contain[s] evidence of a mental impairment that allegedly prevent[s] [a] claimant from working, the Secretary [is] required to follow the procedure for evaluating the potential mental impairment set forth in his regulations to document the procedure accordingly." Id. at 975.

Here, evidence of a mental impairment is lacking.  As Plaintiff notes, in evaluating the degree of functional loss, the Commissioner considered four essential areas of function: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) deterioration or decompensation in work or work-like settings.  20 C.F.R. § 404.1520.  ALJ Muehlig based his findings on medical evaluations provided by Dr. Block and Dr. Brams.  (Tr. 25.)  Dr. Block, a consultative examiner,  noted that Plaintiff's "mental status show[ed] no deficiency."  (Tr.320.)

Similarly, Dr. Brams, a State agency psychologist, noted that Plaintiff's mental impairment was not severe.  (Tr. 342.)  Dr. Brams found that Plaintiff suffered mild restrictions of activities of

daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  (Tr. 352.)  Dr. Brams also found no episodes of decompensation, each of extended duration.  (Id.)  20 C.F.R. § 404.1520a provides that if a rating in the first three functional areas are "none" or "mild," and the rating in the fourth area is "none," the conclusion that a Plaintiff's impairments are *not severe* is proper.  See § 404.1520a(d)(1).  The ALJ's findings with respect to Plaintiff's mental impairment was therefore supported by substantial evidence, and this Court finds it proper.

### 3.   *Whether the ALJ failed to Evaluate Plaintiff's Pain and Other Symptoms Properly*

Plaintiff further contends that the ALJ failed to evaluate her subjective complaints properly. (Pl. Br. 12-15.)  Plaintiff complained of chest pains three times a week, pains caused by stress and frequent movement, and intense headaches among others.  (Id. at 14.)  Plaintiff argues that ALJ Muehlig's "decision notes [her] . . . subjective complaints of episodes of chest pain, shortness of breath, and palpitations, [but] fails to consider the entire record."  (Id. at 13.)

"An ALJ must consider a claimant's subjective symptoms, including pain, and may not discount those symptoms if they are reasonably consistent with the objective medical evidence and other evidence in the record."  Robleto v. Barnhart, No. 05-4843, 2006 WL 2818431, at *10 (E.D. Pa. 2006) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1275-76 (3d Cir. 1987); 20 C.F.R. § 404.1529).  "It is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to give to the evidence."  Id. (citing Plummer, 186 F.3d at 429; and Mason v. Shalala, 99 F.2d 1058, 1066 (3d Cir. 1993)).  An ALJ's "credibility determinations are entitled to great deference and should not be discarded lightly."  Id.  (citing Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003)).

A Plaintiff "'bears the burden of demonstrating that [her] subjective complaints were substantiated by medical evidence.'"  Person v. Barnhart, 380 F. Supp.2d 496, 508 (D.N.J. 2005) (citing Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995), aff'd per curiam 85 F.3d 611 (3d Cir. 1996)).  However, a Plaintiff's "subjective complaints of pain will not be conclusive evidence of disability absent objective medical evidence that demonstrates the existence of [the] medical impairment."  Robleto, 2006 WL 2818431, at *10 (citing 20 C.F.R. § 416.929(a); Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999)).  Here, Plaintiff references in her brief, "a completed pain questionnaire," but points to no further objective medical evidence to support her claims.  (See Pl. Br. 12-15.)

As noted by ALJ Muehlig, exams by both independent and state agency doctors failed to demonstrate the existence of medical impairments which could be expected to produce Plaintiff's subjective claims.  (Tr. 25.)  Plaintiff complained of chest pain, shortness of breath, and palpitations.  According to Dr. Vastesaeger's February 12, 2002 consultative exam, however, Plaintiff had a normal EKG, a heart within normal limits, and was not in acute respiratory distress. (Tr. 25, 32, 298, 299, 302.)  Moreover, Plaintiff noted that "[s]he never had heart surgery, or surgery to the vessels of the heart."  (Tr. 295.)  Plaintiff also complained of hypertension and non-insulin diabetes, yet the medical record indicates no evidence of end-organ damage, hospitalization due to diabetes or hypertension, or stroke.

 Plaintiff further complained of disabling pain and limitations.  Plaintiff's residual functional capacity assessment, however,  indicates Plaintiff can frequently lift up to 25 pounds, stand or walk about 6 hours in an 8 hour day, sit for about 6 hours in an 8 hour day, and can push and/or pull, if required.  (Tr. 325.)  Plaintiff has also reported that she cleans her house, does cooking and cleaning, and goes to church three times a week.  (Tr. 319.)

22

ALJ Muehlig concluded that while Plaintiff's "impairments may impose some discomfort and limitation, they [were] not disabling and d[id] not preclude work related activities." (Tr. 26.) This Court concludes that ALJ Muehlig's determination that Plaintiff's subjective complaints are not fully credible is amply supported by the evidence in the record.

> **4.    Whether the ALJ's finding that Plaintiff had the Residual Functional Capacity to Return to Her Past Relevant Work was Based on Substantial Evidence**

Plaintiff contends that the ALJ's finding that she had the residual functional capacity to return to her past work as a towel cleaner was not based on substantial evidence. ALJ Muehlig disagreed, and found that Plaintiff could continue to perform her job as a towel cleaner. (Tr. 26.) "[A] claimant carries the initial burden of showing a disability that prevents return to [her] former employment." Pelletier v. Sec'y of Health, Educ. and Welfare, 525 F.2d 158, 160 (1st Cir. 1975).

According to Plaintiff:

> [o]n March 26, 2002, a State Agency physician's residual functional capacity assessment limited [her] to medium work with limitations on occasional climbing, balancing, kneeling, and crouching, frequently kneeling and crawling, and with the avoidance of concentrated exposure to extreme cold, extreme heat, extreme wetness, and extreme humidity.

(Pl. Br. 15.)

On an August 14th, 2001 Work History Report, Plaintiff noted that her job as a towel cleaner required 8 hours of sitting. (Tr. 82.) Plaintiff's job description included none of the functions Plaintiff contends she is limited to. In response to a question regarding how many hours Plaintiff's towel cleaning job required her to: walk, stand, sit, climb, stoop, kneel, crouch, crawl, handle, grab or grasp big objects, or write, type and handle small objects, Plaintiff indicated that she *did not* walk, stand, climb, stoop, kneel, crouch, crawl, handle, grab or grasp big objects, or write, type and handle small objects. (Id.)

23

Plaintiff asserts that according to Dr. Burke, her symptoms "will have some impact" on her "ability to function in an effective persistent manner at work."  (Pl. Br. 16; see also Tr. 339.)  Plaintiff also contends that ALJ Muehlig "[did] not adequately address these assessments."  (Pl. Br. 16.)  Plaintiff fails to note, however, that Dr. Burke also opined that Plaintiff could sit for a total of 6 hours in an 8 hour workday, stand or walk for at least 2 hours in an 8 hour workday, and occasionally lift and or carry up to 20 pounds, among others.  (Tr. 335.)  Moreover, ALJ Muehlig, before reaching his conclusion, noted that "it was evident that . . . [Plaintiff] suffers some pain and limitations due to her impairments," and thus "her capacity to perform work ha[d] been significantly affected."  (Tr. 26.)

ALJ Muehlig also relied on the opinion of Dr. Vastesaeger.  (Tr. 24.)  According to Dr. Vastesaeger, Plaintiff mounted and got off a table well, and had "no atrophy or weakness in the limbs."  (Tr. 297.)

Based on a review of all the medical evidence records, this Court finds that ALJ Muehlig's finding that Plaintiff had the residual functional capacity to return to her past relevant work is supported by substantial evidence.  Plaintiff has failed to meet her burden of showing she could not return to her past relevant work.

## IV.  CONCLUSION

For the reasons stated above, this Court finds that the Commissioner's decision is supported by substantial evidence and is affirmed.

S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date: December 18, 2006

24